UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VERTEX DEVELOPMENT,
LLC,

        Plaintiff,

v.                          Case No. 8:22-cv-2012-VMC-CPT

PINELLAS COUNTY,
FLORIDA,

        Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Plaintiff Vertex Development, LLC's Motion for Summary Judgment (Doc. # 18) and Defendant Pinellas County, Florida's Motion for Summary Judgment (Doc. # 19), both filed on January 9, 2023. The parties responded to each Motion on January 30, 2023. (Doc. ## 20; 21). For the reasons that follow, Vertex's Motion is granted, and Pinellas County's Motion is denied.

I.    **Background**

    A.    **The Proposed Tower and Vertex's Application**

Vertex Development, LLC, is a limited liability company with a principal place of business in Tampa, Florida. (Doc. # 5 at 1). According to Vertex, it provides services to various licensed personal wireless telecommunications

1

providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities. (Id. at ¶ 6).

Vertex seeks to build a 120-foot camouflaged telecommunications tower (the "Proposed Tower") on a parcel of land owned by Christ the King Lutheran Church, Inc. (the "Church Property"). (Administrative Record ("AR") Doc. # 17-1 at 3-5, 12-13). The Church Property, which is located at 11220 Oakhurst Road, Largo, Florida, is zoned R-2 under the Pinellas County Land Development Code (the "LDC") and contains approximately 6.748 acres. (Id. at 3-4, 33). The Church Property is bordered by single family residences to the immediate north, south, and west. (Id. at 39). These residences are also zoned R-2. (Id.). Thus, the contiguous uses surrounding the church property are predominately single-family residential. The compound containing the Proposed Tower is located in the southwest corner of the Church Property. (Id.). The parties dispute whether the southwest corner abuts 8 or 12 single-family residential properties. (Doc. # 19 at ¶ 12; Doc. # 20 at ¶ 12).

Under LDC Section 138-3313(c)(1)(b), camouflaged telecommunication towers are a permitted use at a maximum height of 75 feet in the R-2 zoning district. LDC § 138-3313(c)(1)(b). LDC Section 138-3313(c)(9) provides that

proposed communications towers may seek flexibility to the height standards, subject to Type 2 Use Approval. Id. § 138-3313(c)(9). In accordance with this section, on June 21, 2022, Vertex applied to the Board for a Type 2 Use Approval to allow it to construct a 120-foot-tall wireless telecommunications tower and supporting equipment. (AR Doc. # 17-1 at 10).

The camouflage technique proposed is a monocross, which is a tower designed to resemble a cross. (Id. at 32-33). The Proposed Tower would accommodate antenna equipment owned and operated by Verizon Wireless as the anchor tenant, as well as antenna equipment owned and operated by three future tenants. (Id. at 13). The Proposed Tower's setbacks from the Church Property lines are 319 feet 11 inches from the north, 501 feet 1 inch from the east, and 122 feet from both the south and west. (Id. at 39). The setbacks from the residential property are the same, except the setback to the east for residential property is 584 feet 4 inches. (Id.). The Proposed Tower is between 148 and 195 feet from the corners of the six nearest single-family residences. The Proposed Tower meets the required setbacks from abutting residential property lines. LDC § 138-3313(c)(2).

LDC Section 138-3313(c)(7)(a) requires towers to be enclosed by security fencing a minimum of six feet in height.

LDC § 138-3313(c)(7)(a). The Proposed Tower compound includes an 8-foot-tall PVC security fence and is designed to have a 46-foot fall zone radius. (AR Doc. # 17-1 at 36, 40). The outer edges of the fall zone radius are 76 feet from the adjacent residential property lines to the immediate west and south. (Id. at 38, 39).

The southwest corner of the Church Property contains several mature trees along the western boundary line and several within the proposed Vertex lease area and compound. (Id. at 36). The plans for the Proposed Tower compound include an eight-foot-tall fence around the 240-foot perimeter, as well as a five-foot-wide landscaped buffer. (Id. at 40). The planned five-foot-wide landscaped buffer consists of six 12-foot-tall, 2.5-inch diameter slash pine trees, six 12-foot-tall, 2.5-inch diameter laurel oak trees, and a 30-inch-tall hedge of Ligustrum shrubs. (Id. at 44). However, the plans for the Proposed Tower compound require the removal of three mature trees from the leased parcel, including a 14-inch diameter oak tree, a 13-inch diameter oak tree, and a 12-inch diameter maple tree. (Id. at 44).

**B.   Denial of the Application**

On August 3, 2022, the Pinellas County Board of Adjustment and Appeals (the "Board") conducted a public

4

hearing where it heard Vertex's application. (Id. at 112). In preparation for the hearing, the Pinellas County Zoning Staff reviewed Vertex's application and determined the application met all the criteria for granting a Type 2 use. (Id. at 53–54, 117). Accordingly, the Zoning Staff recommended approval. (Id. at 54). In doing so, the Zoning Staff stated in writing that the recommendation of conditional approval was not a final decision on the matter, and that the Board would make the final decision following the public hearing. (Id. at 53).

At the hearing, Vertex presented as the applicant, sixteen citizens testified in opposition, and representatives of Vertex testified in support. (Id. at 117–18). The testifying citizens raised several concerns, including but not limited to the aesthetic impact of the tower, the potential negative impact on home values, the number of existing antennas near the proposed site, the plans to remove trees, and safety concerns related to the tower falling. (Hearing Transcript, Doc. # 17-5 at 10:18–24, 8:24–9:3, 11:11–16, 12:10–11, 17:18–19).

With respect to the aesthetic impact of the tower, resident Lori Miller expressed concern about the sight lines from her residence to the location of the Proposed Tower. (Id. at 8:12–22). Residents Barb Mears, Matthew Calavac,

Crystal Cheryl, and Larry Krueger expressed their concern with the general aesthetic impact of the tower. (Id. at 10:18–24, 13:14–17, 15:20–16:3, 33:20–34:2). Several residents emphasized the inconsistency of the tower with the residential neighborhood. (Id. at 8:19–22, 15:25–16:3, 20:15–22, 24:15–19, 28:2–7). In addition, fourteen citizens submitted written comments prior to the hearing, three of which expressed concerns over the Proposed Tower's aesthetic impact. (AR Doc. # 17-1 at 91, 105, 107). Of those three concerns, two writers described the Proposed Tower as an "eyesore," and one opined that it would "destroy the aesthetics" of the residential area. (Id.).

At the public hearing, the residents also expressed concerns with the potential impact of the tower on property values. (Hearing Transcript, Doc. # 17-5 at 8:24–9:3, 10:20–22, 18:15–21, 20:2–6, 21:23–24:3). One resident stated she discussed the issue with a "real estate man," who relayed that the tower would reduce the pool of people interested in her house. (Id. at 18:16–18). Another resident cited studies from the U.S. Department of Housing and Urban Development and the National Association of Realtors concerning the impact of cell towers on property values. (Id. at 20:3–11). In an email to the Board prior to the public hearing, one resident cited

an article in the Journal of Real Estate Finance and Economics. (AR Doc. # 17-1 at 97-98).

During the Board's deliberation, Board Member Bomstein indicated the importance of considering the aesthetics of placing the proposed tower "within a very dense residential neighborhood." (Hearing Transcript, Doc. # 17-5 at 47:1-3). Board Member Gephart commented on the difference between a 75-foot tower and the proposed 120-foot tower, emphasizing the aesthetic impact of the additional height. (Id. at 54:3-8).

Board Member Bomstein thereafter introduced a motion to deny Vertex's request due to a lack of evidence that the Proposed Tower met the Type 2 use criteria of LDC Section 138-241(b), which governs the separation of the proposed used from adjacent and nearby uses by screening devices, buffer areas, or other appropriate means. (Id. at 54:23-55:9).

The Board ultimately denied Vertex's application on a 4-1 vote. (AR Doc. # 17-1 at 119). Thereafter, on August 10, 2022, Pinellas County issued its written order denying the application for the Proposed Tower. (Id. at 1). The written order provided:

> Please be advised that by action of the Pinellas County Board of Adjustment and Appeals on August 3, 2022, your request for a

7

> Type 2 use to allow construction of a 120-
> foot-tall, camouflaged communication tower
> and related support facilities, for the R-2
> zoned property located at 11220 Oakhurst Road
> in unincorporated Largo is denied based upon
> the Board's determination that the proposed
> increase in height for the communication tower
> creates a negative aesthetic impact on the
> surrounding properties and the criteria for
> granting a Type 2 use in Section 138-241(b) of
> the Pinellas County Land Development Code was
> not supported by substantial evidence
> presented at the hearing.

(Id.).

Vertex initiated this action on August 31, 2022. (Doc. # 1). Vertex filed its amended complaint on September 14, 2022. (Doc. # 5). The amended complaint asserts the following claims against Pinellas County: declaratory relief (Count I), and injunctive relief (Count II). (Id. at 7–8). Vertex seeks "an order declaring the County's denial of Vertex's Application for a 120' Camouflaged Tower null and void" and "a mandatory injunction [instructing] the County to approve Vertex's Application as submitted[.]" (Id.).

Pinellas County filed its answer on September 26, 2022. (Doc. # 6). Thereafter, the parties agreed that resolution of the case would be determined by the closed record of Pinellas County's proceedings concerning Vertex's Type 2 use application. (Doc. # 12 at 2-3). Accordingly, the parties did not engage in any additional discovery. (Id.; Doc. # 13).

Now, the parties both seek entry of summary judgment in their favor. (Doc. ## 18; 19). The Motions have been briefed (Doc. ## 20; 21) and are ripe for review).

## II.  <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260

(11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

10

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

## III. **Analysis**

Both parties have filed Motions for Summary Judgment (Doc. ## 18; 19). The Court will begin by addressing Vertex's Motion, followed by Pinellas County's Motion.

### A.   **Vertex's Motion for Summary Judgment**

"Congress enacted the [Federal Telecommunications Act of 1996] to 'promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies.'" PI Telecom Infrastructure v. City of Jacksonville, 104 F. Supp.

3d 1321, 1336 (M.D. Fla. 2015) (quoting <u>Michael Linet, Inc.</u> <u>v. Vill. of Wellington</u>, 408 F.3d 757, 761 (11th Cir. 2005)). The Act "generally preserves 'the traditional authority of state and local governments to regulate the location, construction, and modification' of wireless communications facilities like cell phone towers, but imposes 'specific limitations' on that authority." <u>T-Mobile S., LLC v. Roswell</u>, 574 U.S. 293, 300 (2015) (quoting <u>Rancho Palos Verdes v.</u> <u>Abrams</u>, 544 U.S. 113, 115 (2005)). Relevant here, the Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii) (2020). "[P]arties adversely affected by a locality's decision [to deny such a request] may seek judicial review." <u>T-Mobile</u>, 574 U.S. at 300.

In this respect, "substantial evidence is 'more than a mere scintilla but less than a preponderance.'" <u>PI Telecom</u>, 104 F. Supp. 3d at 1341 (citation omitted). "[T]o determine whether a locality's denial was supported by substantial evidence, . . . courts must be able to identify the reason or reasons why the locality denied the application." <u>T-Mobile</u>,

574 U.S. at 300. "[T]hese reasons need not be elaborate or even sophisticated, but . . . simply clear enough to enable judicial review." Id. at 302. Courts "should view the record in its entirety, including evidence unfavorable to the state or local government's decision." Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1218 (11th Cir. 2002).

"[R]eview of a local government's decision to deny a cell tower application is colored by the requirements of the local zoning ordinance." Wireless Towers, LLC v. City of Jacksonville, 712 F. Supp. 2d 1294, 1303 (M.D. Fla. 2010). As relevant here, LDC Section 138-241 sets forth the following determinations to be made by the reviewing body:

> (a)   The proposed use is consistent with the Pinellas County Comprehensive Plan and with the purpose and intent of the applicable zoning district.
>
> (b)   There is adequate separation of the proposed use and related structures from adjacent and nearby uses by screening devices, buffer area, and/or other appropriate means.
>
> (c)   Adequate drives, walkways, and parking are available or proposed so that no vehicular circulation or parking problems are created.
>
> (d)   The proposed use will not create excessive vehicular traffic or other traffic problems.

(e)     Drainage problems will not be created
        on the subject property or nearby
        properties.

(f)     All provisions and requirements of the
        applicable zoning district will be
        met, unless otherwise varied by the
        authorized reviewing body as
        authorized by this Code.

LDC § 138-241.

Additionally, "[t]he party seeking to overturn the
governing body's decision bears the burden of showing that
the decision is not supported by substantial evidence." PI
Telecom, 104 F. Supp. 3d at 1342 (citing Am. Tower LP v. City
of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002)). And
while the statute requires the decision on the permit
application be "in writing," that writing need not be reduced
to a "single writing that itself contains all of the grounds
and explanations for the decision." T-Mobile South, LLC, v.
City of Milton, Ga., 728 F.3d 1274, 1285 (11th Cir. 2013).
Rather, "it is sufficient if the [reasons for the decision]
are contained in a different written document or documents
that the applicant is given or has access to." Id. In that
vein, reviewing courts should consider "[a]ll of the written
documents . . . collectively." Id.

The crux of Vertex's argument is that the denial of its application for the Proposed Tower was improper because the citizen testimony presented in opposition relied on generalized aesthetic concerns, without relying on any objective criteria. (Doc. # 18 at 16–17). Pinellas County's position is that the evidence of the Proposed Tower's inadequate separation from the adjacent residential neighborhood as well as the negative aesthetic impact constitutes substantial evidence. (Doc. # 19 at 19).

As explained in its letter denying Vertex's application, the Board based its decision on (1) evidence of an inadequate separation of the proposed tower and tower compound from the adjacent residential properties used as single-family dwellings by screening devices, buffer area or other appropriate means and (2) the negative aesthetic impact on the surrounding properties. (AR Doc. # 17-1 at 1). These reasons reflect the concerns highlighted at the public hearing, which centered on three general themes: the potential aesthetic impact of the Proposed Tower; the separation between the Proposed Tower and the adjacent residential neighborhood; and the incompatibility between the Proposed Tower and the neighborhood and the resulting impact on property values. (Hearing Transcript, Doc. # 17-5 at 15:20–

21, 55:3–54:2, 10:17–24). The Court will address each of these concerns in turn.

## 1.    __The Aesthetic Impact of the Proposed Tower__

Several of the residents' concerns at the public hearing focused on the potential aesthetic impact of the Proposed Tower on the adjacent residential neighborhood. (Hearing Transcript, Doc. # 17-5 at 10:18-24, 13:14-17, 15:20-16:3, 33:20-34:2). "Aesthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the board. Mere generalized concerns regarding aesthetics, however, are insufficient to create substantial evidence justifying the denial of a permit under § 704(a) of the TCA." Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1219 (11th Cir. 2002) (emphasis in original) (internal citations omitted). In other words, "aesthetic concerns *can* be a valid basis for denial of a permit by a local governing body, *so long as* a judgment based on those concerns is supported by objective facts or evidence." Verizon Wireless Pers. Commc'ns LP v. City of Jacksonville, Fla., 670 F. Supp. 2d 1330, 1341 (M.D. Fla. 2009) (emphasis in original).

Courts have found actual evidence of an aesthetic visual impact where opponents of the tower have demonstrated the

16

extent of its visibility through photo simulations or a balloon test. See, e.g., Wireless Towers, 712 F. Supp. 2d at 1304 (finding aesthetic concerns a sufficient basis to deny an application to construct a tower where photo simulations demonstrated the tower's visual obtrusiveness). For example, in Wireless Towers, the court found objective evidence of aesthetic concerns where the local governing body reviewed photo simulations depicting selected views of the proposed tower from the areas surrounding the parcel upon which it would be built. Id. There, the application to build the tower contained photo simulations which depicted the tower's rise above the tree line and its visibility to residents in the adjacent subdivision. Id. at 1298. At the public hearing, Plaintiff's expert presented the photo simulations, going through each simulation individually. Id. at 1299. The court thus upheld the city's denial of the application permit, reasoning that the photo simulations provided objective evidence of the proposed tower's aesthetic incompatibility with the surrounding area. Id. at 1304. Notably, the surrounding area was deemed to be environmentally sensitive, which was a salient consideration under the local zoning ordinance. Id. at 1296. The court thus specifically

highlighted the tower's incompatibility with an area emphasized to be sensitive by the local code. Id. at 1304.

Likewise, in Southeast Towers, LLC v. Pickens County, Georgia, 625 F. Supp. 2d 1293, 1303 (N.D. Ga. 2008), the court found objective evidence of aesthetic impact where the tower would impact "the unspoiled view of . . . a unique historical resource that deserved special protection." The visibility effects of the tower were demonstrated through photographs taken during a balloon test, which reflected the tower's visibility from various locations within the historic district. Id. And in Vertex Development, LLC v. Manatee County, 761 F. Supp. 2d 1348 (M.D. Fla. 2011), the court found substantial evidence to support a denial where, in addition to letters and emails from residents focusing on the specific impact a proposed tower would have on a golf course, the county considered a photo simulation of the tower.

Conversely, courts have reversed a denial of an application where the local governing body merely relied on "speculative concerns about [a] proposed tower's potential visibility." Verizon Wireless, 670 F. Supp. 2d at 1342; see Benjamina Nursery Farm, Inc. v. Miami-Dade Cnty., 170 F. Supp. 2d 1246, 1253 (S.D. Fla. 2001) ("Moreover, the neighbor testimony, while sincere, was largely opinion based and,

18

therefore, lacked sufficient factual content to support the Appeals Board's decision."); Gulfstream Towers, LLC v. Lake Cnty., No. 5:20-cv-443-JSM-PRL, 2021 WL 2907718, at *6 (M.D. Fla. May 7, 2021) (finding no substantial evidence where the citizen testimony "did not offer any specific factual testimony about how much of the Proposed Tower will be visible from their homes or offer any other factual testimony about the tower's visual impact to the area.").

For example, in Verizon Wireless, a letter of concern expressing that a tower would "exist as a blight on the surrounding environment" did not constitute objective evidence of aesthetic impact where nothing in the record indicated that the proposed tower would actually be within the viewscape of a nearby nature preserve. Verizon Wireless, 670 F. Supp. 2d at 1343. In particular, the court focused on the fact that the residents offered only their opinions on the impact on the tower, without adducing objective evidence to support a finding that the tower would adversely affect the aesthetics of the surrounding area. Id.

Likewise, in Vertex Development, LLC v. Marion County, No. 5:7-cv-380-WTH-GRJ, 2008 WL 2994259, at *15 (M.D. Fla. Aug. 1, 2008), the court evaluated the denial of a permit based on public testimony focused on the fact that the tower

19

would be an "eyesore" and ruin the beauty of the surrounding areas. The court found such testimony did not rise to the level of substantial evidence as it took the form of "purely subjective concerns as opposed to articulated, fact based reasons keyed to any of the objective requirements (or limitations) of the County Code." Id. Further, in response to the public testimony concerning the proximity of the tower to residential property lines, the court found that "proximity concerns are specifically addressed by the [County] Code's established setback requirements," which the Plaintiff exceeded. Id. at *16.

Here, the record reflects that the resident opposition to the Proposed Tower took the form of generalized grievances, rather than objective, factual concerns keyed to the county code. See Marion County, 2008 WL 2994259, at *15 (reversing a denial of a permit where the aesthetic concerns were not grounded in the objective requirements of the county code). Of the fourteen written comments submitted prior to the public hearing, only three mention aesthetics. (AR Doc. # 17-1 at 91, 105, 107). Of those three, two writers simply used the word "eyesore" to describe the Proposed Tower. (Id. at 91, 105). The third expressed that the Proposed Tower would "destroy the aesthetics" of the residential area. (Id. at

107). Similarly, at the public hearing, one resident expressed her concern that she would be able to view the Proposed Tower from the windows of her house. (Hearing Transcript, Doc. # 17-5 at 18:12–22). Three residents cited general aesthetic concerns in opposition to the Proposed Tower. (Id. at 10:18–24, 13:14–17, 15:20–16:3). One resident stated he was "a little worried" that shadows from the tower would obstruct his view of the sunset. (Id. at 33:20–34:2).

This case is thus dissimilar from Wireless Towers and Manatee County, where the local governing bodies considered photo simulations demonstrating the extent of a proposed tower's visibility. See Wireless Towers, 712 F. Supp. 2d at 1303–04 (finding substantial evidence on which to base a denial where photo simulations depicted the extent of the proposed tower's visual obtrusiveness); Manatee County, 761 F. Supp. 2d at 1364 (considering photo simulations to deny an application for a tower). Here, in contrast, Pinellas County did not identify any objective evidence it relied on to support the residents' concerns over the Proposed Tower's aesthetic impact. While some of the residents opined generally that the tower would be an "eyesore," these opinions did not adduce any evidence on the extent of the Proposed Tower's visibility. (AR Doc. # 17-1 at 91, 105). Only one

resident stated that the Proposed Tower would actually be visible from her residence. (Hearing Transcript, Doc. # 17-5 at 18:12–22). Another resident suggested the Proposed Tower could affect his view of the sunset, but did not present any objective evidence demonstrating the Proposed Tower was in the viewscape of his residence. (Id. at 33:20–34:2). Unlike in Southeast Towers, where the Proposed Tower was found to threaten the view of a historical resource, as evinced through photographs taken during a balloon test, the citizens' concerns here are speculative and subjective. See Se. Towers, LLC, 625 F. Supp. 2d at 1303 (finding a balloon test showed objective evidence of an aesthetic impact).

Indeed, the residents' concerns here are more like those in Verizon Wireless and Marion County. See Verizon Wireless, 670 F. Supp. 2d at 1343 (finding no substantial evidence where residents expressed aesthetic concerns without presenting objective evidence); Marion County, 2008 WL 2994259, at *15 (finding no substantial evidence where the public testimony presented was "nothing more than purely subjective concerns"). Like in Verizon Wireless, the residents' concerns about the aesthetic impact of the Proposed Tower amount to nothing more than opinion testimony. See Verizon Wireless, 670 F. Supp. 2d at 1343 ("[T]he opinions of the letter-writers

cannot support a finding that Verizon's monopine will have an adverse aesthetic impact on the surrounding area."). The residents did not present any objective evidence on the extent to which the Proposed Tower would be visible, or the impact it would have on the residential neighborhood. Rather, the residents opined, in general terms, that the Proposed Tower would be an "eyesore." (AR Doc. # 17-1 at 91, 105). While the Court does not doubt the sincerity of the residents' concerns, these generalized complaints are insufficient to rise to the level of substantial evidence. See Marion County, 2008 WL 2994259, at *15 (finding concerns that a proposed tower would be an "eyesore" purely subjective); Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1219 (11th Cir. 2002) ("[G]eneralized concerns about aesthetics are insufficient to constitute substantial evidence upon which the Board could rely.").

The cases cited by Pinellas County where courts upheld the denial of an application to construct a cell tower on aesthetic grounds are distinguishable from the case at bar. First, Pinellas County cites North American Towers LLC v. City of Lakeland, No. 8:20-cv-3006-VMC-AAS, 2021 WL 2941759 (M.D. Fla. July 13, 2021) — a decision by this Court — for the proposition that visibility and proximity to residences

23

can constitute substantial evidence. (Doc. # 19 at 24). There, this Court found substantial evidence to support a denial of an application where evidence of the size of the property, its proximity to residential uses, and the scale of the structure were presented at a public hearing. N. Am. Towers, 2021 WL 2941759 at *5-6. However, the relevant local zoning ordinance in North American Towers differed from the that applicable to this case. See Wireless Towers, F. Supp. 2d at 1303 (noting that courts should review a denial with an eye to the requirements of the local zoning ordinance). Importantly, the ordinance in North American Towers provided that the local governing body should consider factors including "[t]he height and visual obtrusiveness of the facility" and "[t]he degree of visibility from the public view[.]" N. Am. Towers, 2021 WL 2941759, at *7 (citing City of Lakeland Land Dev. Code § 5.18.7.c.). In contrast, the Pinellas County LDC omits any reference to the visual obtrusiveness of the facility or its degree of visibility. See LDC § 138-241 (setting forth the factors for the County to consider when evaluating applications for Type 2 uses). Thus, that this Court upheld a denial in North American Towers does not compel it to do the same here.

24

Similarly, Pinellas County cites Wireless Towers to illustrate a court upholding a denial based on the governing body's subjective determination that the proposed tower was incompatible with the surrounding area given the height and design of the tower, and sensitivity of the affected land. (Doc. # 19 at 24); see Wireless Towers, 712 F. Supp. 2d at 1304–05 (finding substantial evidence supporting a denial of an application to build a tower). However, there, the applicable local ordinance specifically directed the Jacksonville Planning Commission to consider "the potential adverse impact upon any environmentally sensitive lands[.]" Id. at 1296 (citing Jacksonville Ordinance Code § 656.1506). The court's reasoning, whereby it found the tower to be "incompatible with the surrounding area given its height, design, and the sensitivity of the affected land" reflects its consideration of the zoning ordinance. Id. at 1304.

In short, the aesthetic concerns relating to the Proposed Tower at issue here are generalized and lacking in factual support. While the Court appreciates the residents' concerns about the impact of the Proposed Tower, like in Verizon Wireless, these concerns reflect the residents' opinions, rather than objective evidence on the extent of the Proposed Tower's visibility and its effect on the surrounding

area. See Verizon Wireless, 670 F. Supp. 3d at 1343 (finding
no substantial evidence where concerns over aesthetics
reflected opinions rather than objective facts). Such
generalized concerns do not constitute substantial evidence
on which the Board can properly base its denial of Vertex's
application.

## 2. **Adequate Separation**

The second theme of the evidence in opposition to the
Proposed Tower reflects the residents' view that there exists
inadequate separation between the Proposed Tower and the
adjacent residences. (Doc. # 19 at 26). According to Pinellas
County, its decision to deny Vertex's application was
supported by evidence of the Proposed Tower's close proximity
to residential properties and the minimal separation that the
proposed landscaped buffer would provide. (Doc. # 19 at 28–
29).

Under the LDC, it was appropriate for the Board to
consider the Proposed Tower's proximity to the residential
area and its landscaped buffer in evaluating Vertex's
application. In determining whether to grant an application
for a Type 2 use, the Board's considerations include whether
"[t]here is adequate separation of the proposed use and
related structures from adjacent and nearby uses by screening

devices, buffer area, and/or other appropriate means." LDC § 138-241.

However, courts have found proximity concerns insufficient to support a denial of an application where the proposed tower otherwise meets all the objective criteria set forth in the local zoning code. For example, in Marion County, the court found that the residents' concerns that the tower would be too close to their properties could not "constitute substantial evidence because proximity concerns are specifically addressed by the Code's established setback requirements," which the Plaintiff had met. Marion County, 2002 WL 2994259, at *16. Likewise, in Verizon Wireless, the court noted that the objective portion of the local code, which dictated the setback requirements, precluded the city from denying the application for the proposed tower based on "proximity *alone* where the setback requirements have been met[.]" Verizon Wireless, 670 F. Supp. 2d at 1343-44.

Similarly, a district court has found proximity insufficient to support a denial even where the proposed tower at issue would still be visible from a surrounding neighborhood. See PI Telecom Infrastructure, LLC v. City of Jacksonville, FL, 104 F. Supp. 3d 1321, 1344 (M.D. Fla. 2015) (finding that subjective evidence concerning proximity and

aesthetics could not support a denial of an application but upholding the denial on other grounds). There, the court recognized that the proposed tower – which was to be 100 feet from the southwest corner of a proposed mixed-commercial/residential development – may obstruct the views of some of the units. Id. However, because the Plaintiff had met the applicable setback requirements, the court found the proximity concerns alone insufficient to support the denial of the application. Id.

Here, like in Marion County and Verizon Wireless, the Proposed Tower fully complies with the setback requirements set forth in LDC Section 138-3313(c)(1). Under Section 138-3313(c)(2), "[n]ew towers shall be set back from abutting residential property lines a distance equal to the height of the tower." LDC § 3313(c)(2). The Proposed Tower is set back 319 feet 11 inches from the north, 584 feet 4 inches from the east, and 122 feet from both the south and the west. (AR Doc. # 17-1 at 39). Because the Proposed Tower is 120 feet, it fully complies with the LDC setback requirements.

The Court recognizes Pinellas County's position that the landscaped buffer will be insufficient to adequately separate the Proposed Tower from the adjacent residential area. However, as explained, any concerns about adequate separation

28

are addressed by the Proposed Tower's compliance with the
setback requirements. See LDC § 3313(c)(2) (requiring new
towers to be set back from abutting residential property lines
a distance equal to the height of the tower). Indeed, LDC
Section 138-241 requires adequate separation of the Proposed
Tower from adjacent and nearby uses by "screening devices,
buffer area, and/or other appropriate means." LDC § 138-241.
While a vegetative buffer may be sufficient to provide
adequate separation, the LDC does not indicate that it is
necessary. Here, the Proposed Tower's compliance with the
LDC-prescribed setback requirements provides adequate
separation from the residential area. (Hearing Transcript,
Doc. # 17-5 at 41:20–42:3); see Cellular South Real Estate,
Inc. v. City of Mobile, Ala., 2016 WL 3746661, at *5 (S.D.
Ala. July 8, 2016) (finding that compliance with setback
requirements can effectively "buffer" a proposed tower from
nearby residences). Like in PI Telecom, "concerns about
proximity alone cannot support a finding of incompatibility
where the proposal meets the applicable setback
requirements." PI Telecom, 104 F. Supp. 3d at 1344. While
Vertex makes no representation that the Proposed Tower will
not be visible, the proposal nevertheless complies with the
applicable code requirements. Thus, the Proposed Tower's

proximity to the adjacent residential properties cannot support the Board's denial.

### 3. Incompatibility with Residential Neighborhood and Property Values

The final theme of evidence presented in opposition to the Proposed Tower is that the tower is incompatible with the surrounding residential area and will thus depress property values. (Hearing Transcript, Doc. # 17-5 at 10:17–24).

As an initial matter, the LDC permits camouflaged telecommunications towers up to 75 feet tall in the R-2 zoning district. LDC § 138-3313(c)(1)(b). Thus, any argument that the Proposed Tower was per se incompatible with the surrounding residential area is unavailing. As a matter of policy, Pinellas County has determined that telecommunications towers may coexist with a residential neighborhood.

Given that towers of up to 75 feet in height may be constructed in the relevant zoning area, the evidence in opposition to the tower fails to home in on any detrimental effects resulting from the increase in height. The residents' concerns focused on the incompatibility of the Proposed Tower with the neighborhood in general, rather than parsing out the downsides of the increased height. For example, one resident

emphasized that "[t]his is a small residential area." (Hearing Transcript, Doc. # 17-5 at 24:17). Another stated that the area "is not an appropriate location for a commercial communication tower." (Id. at 28:6 -7). Because these concerns focus on the incompatibly of a tower with the neighborhood as a general matter, rather than the incompatibility of the Proposed Tower's increased height, the Court finds they are insufficient to rise to the level of substantial evidence.

The same can be said for the evidence concerning property values. First, any impact to property values is not an articulated criterion for reviewing tower applications in either LDC Section 138-3313 or the Type 2 standard set forth in Section 138-241. Indeed, during the public hearing, County Attorney Morris noted that the Proposed Tower "is a valid and lawful use of the property. And property values of the adjacent neighboring properties should not be considered." (Hearing Transcript, Doc. # 17-5 at 22:20-22).

Second, the evidence concerning property values considered by the Board related only to the impact of erecting a tower, not any increase in height. The majority of the residents' comments related to property values took the form of general and layperson concerns. (Id. at 8:24-9:3, 10:20-

22, 18:15–21, 20:2–6, 21:23–24:3); compare Am. Tower LP v. City of Huntsville, 295 F.3d 1203, 1208 (11th Cir. 2002) (finding substantial evidence to support a denial where a realtor with 16 years of experience testified that towers make it harder to sell houses and that she had already lost potential buyers). Of the 2 residents that indicated they had reviewed the relevant research on the effect of property values, neither presented evidence focusing on the negative impact that the increase in height from 75 to 120 feet may have. In sum, the Court's review of the evidence does not reveal any basis for the Board to find that an increase in height, rather than merely building a tower of any height, would depress property values.

In short, there was not substantial evidence in support of the Board's decision. Thus, Vertex is entitled to summary judgment.

**B.   Pinellas County's Motion for Summary Judgment**

As the Court has already determined that summary judgment in favor of Vertex is appropriate, the Court denies Pinellas County's Motion for Summary Judgment (Doc. # 19).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

32

(1)   Defendant Pinellas County, Florida's Motion for Summary Judgment (Doc. # 19) is **DENIED.**

(2)   Plaintiff Vertex Development, LLC's Motion for Summary Judgment (Doc. # 18) is **GRANTED** to the extent that the County's denial of Application TY2-22-11 is declared a violation of 47 U.S.C. § 332(c). Defendant's Order denying the Type-2 Use Application (TY2-22-11) is declared null and void.

(3)   The Court reserves ruling on Plaintiff's request for a mandatory injunction pending efforts between the parties to resolve this issue. The parties shall file a joint status report within forty-five (45) days of this Order concerning the status of their efforts.

(4)   The Clerk shall administratively close the case pending receipt of the parties' joint report.

   **DONE and ORDERED** in Chambers in Tampa, Florida, this 3rd day of April, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE